Slip Op. 26-113

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**STUPP CORPORATION ET AL.,**

**Plaintiffs and Consolidated Plaintiffs,**

**and**

**MAVERICK TUBE CORPORATION,**

**Plaintiff-Intervenor and Consolidated Plaintiff-Intervenor,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**SEAH STEEL CORPORATION and HYUNDAI STEEL COMPANY,**

**Defendant-Intervenors and Consolidated Defendant-Intervenors.**

**Before: Claire R. Kelly, Judge**

**Consol. Court No. 15-00334**

**OPINION AND ORDER**

[Sustaining the U.S. Department of Commerce's fourth remand redetermination in the less-than-fair-value investigation of welded line pipe from the Republic of Korea.]

Dated: September 15, 2026

Jeffrey M. Winton, Amrietha Nellan, Michael J. Chapman, Vi Mai, Winton and Chapman PLLC, of Washington, D.C., argued for Plaintiff SeAH Steel Corporation.

Douglas G. Edelschick, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were Brett A. Shumate, Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Deputy Director. Of Counsel was Vania Y. Wang, Senior Counsel, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Robert B. Schagrin, Schagrin Associates, of Washington, D.C., argued for plaintiff Welspun Tubular LLC USA. With him on the brief were Jeffrey D. Gerrish and Saad Y. Chalchal.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce") fourth remand redetermination in its 2015 less-than-fair-value investigation of welded line pipe imported from the Republic of Korea ("Korea"). See Final Results of Redetermination Pursuant Ct. Remand, March 16, 2026, ECF No. 278 ("Remand Results"); see also Welded Line Pipe from [Korea], 80 Fed. Reg. 69,637 (Dep't Commerce Nov. 10, 2015) ("Amended Final Determination") and accompanying Issues and Decisions Memo, A-580-876, (Oct. 5, 2015), ECF No. 30-3 ("Final Decision Memo"). In Stupp Corporation v. United States, the Court of Appeals for the Federal Circuit ("Court of Appeals") vacated this court's opinion, remanding to this court to remand to Commerce to re-perform a differential pricing analysis that does not rely on Cohen's d. See Stupp Corporation v. United States, No. 2023-1663, 2025 WL 1178392 (Fed. Cir. Apr. 23, 2025) ("Stupp IV"). This court remanded to Commerce for redetermination. See Order Remanding to Commerce, June 16, 2025, ECF No. 271 ("Order Remanding to Commerce"). Commerce filed its remand results

on redetermination on March 16, 2026. See Remand Results. For the following reasons, the court sustains Commerce's fourth remand redetermination.

**BACKGROUND**

The court presumes familiarity with the facts of this case as set out in this court's previous opinions as well as the Court of Appeals' decisions in Stupp Corporation v. United States, 5 F. 4th 1341 (Fed. Cir. 2021) ("Stupp II") and Stupp IV, and now recounts only the facts relevant to the court's review of the Remand Results. On November 14, 2014, Commerce initiated an antidumping duty investigation of welded line pipe from Korea. See Welded Line Pipe From [Korea], 79 Fed. Reg. 68,213, 68,213 (Dep't Commerce Nov. 14, 2014) (initiation of less-than-fair-value investigation). Commerce published its final determination on October 5, 2015, and found that 39.72% of SeAH Steel Corporation's ("SeAH") U.S. sales passed the Cohen's d test. Final Decision Memo at 4. SeAH challenged Commerce's determination, arguing that Commerce's application of the Cohen's d test was contrary to law and unsupported by substantial evidence. See Stupp Corporation v. United States, 359 F. Supp. 3d 1293, 1302 (Ct. Int'l Trade 2019) ("Stupp I"). The court found that Commerce's differential pricing analysis was supported by substantial evidence because the methodology was a lawful and "reasonable methodology for identifying patterns of prices that differ significantly." Id. at 1304, 1305. On appeal, the Court of Appeals determined that Commerce did not support its application of the Cohen's d test and violated the three conditions necessary to

apply Cohen's d, "assumptions of normality, sufficient observation size, and roughly equal variances associated with that test." Stupp II, 5 F. 4th at 1360. In Stupp II, the Court of Appeals remanded to Commerce to further explain whether the conditions in Cohen's d were satisfied or, in the alternative, need not be observed in less-than-fair-value adjudications. See id. Commerce subsequently filed its third redetermination in which it explained why Cohen's d test was appropriate and why the three conditions cited by the Court of Appeals were not relevant. See Final Results of Redetermination Purs. Ct. Remand, April 4, 2022, ECF No. 208 ("Third Remand").

This court sustained Commerce's third remand determination with respect to the reasonableness of its application of the Cohen's d test. See Stupp Corporation v. United States, 619 F. Supp. 3d 1314, 1328 (Ct. Int'l Trade 2023) ("Stupp III"); see also Third Remand. SeAH appealed to the Court of Appeals re-asserting its challenge to Commerce's application of the Cohen's d test. See SeAH Notice of Appeal of Judgment, March 22, 2023, ECF No. 258. The Court of Appeals held that under Marmen Inc. v. United States Wind Tower Trade Coalition, 134 F.4th 1334 (Fed. Cir. 2025) ("Marmen I"), Commerce's use of Cohen's d test was unreasonable because the data involved does not satisfy the statistical assumptions of Cohen's d. See Stupp IV, 2025 WL 1178392 at *2. This court remanded to Commerce, and Commerce issued its fourth remand determination pursuant to the court's order on March 16, 2026. See Order Remanding to Commerce; see also Remand Results. In its remand,

Commerce used a two-percent price difference test instead of Cohen's d to determine whether prices differ significantly. See Remand Results at 6. Commerce also abandoned its mixed methodology in applying its ratio test when determining whether a pattern of significant price differences existed. Id. at 9, 23.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2018), which grants the court authority to review actions initiated under 19 U.S.C. § 1516a(a)(2)(B)(i)[1] contesting the final determination in an antidumping duty order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture Co. v. United States, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014).

## DISCUSSION

On remand, SeAH challenges Commerce's differential pricing analysis on the grounds that Commerce's two-percent price difference test fails to identify whether a difference in price is significant and does not adequately identify a pattern for the purposes of Section 1677f-1(d)(1)(B)(i). See Plaintiff's Comments of SeAH Steel Corporation on Final Redetermination on Remand, May 7, 2026, ECF No. 280 at 11,

---

1 Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

15, 17–20. (“Pl. Cmts.”). SeAH also argues that Commerce’s elimination of its “mixed-methodology” ratio test was beyond the scope of the remand. Id. at 19–23. Defendant and Defendant-Intervenor respond that Commerce reasonably concluded the two-percent price difference test measures significance within the meaning of the statute, and its ratio test reasonably identifies whether a pattern within the meaning of the statute exists. See Def.’s Resp. to Cmts., 15, 23, July 2, 2026, ECF No. 283 (“Def.’s Resp.”); Def.-Int. Resp. to Cmts., 13–20, 27, July 2, 2026, ECF No. 284 (“Def.-Int.’s Resp.”). Further, Defendant and Defendant-Intervenor argue Commerce acted within the scope of remand by reconsidering the application of its ratio test, reasonably abandoned its mixed methodology when remedying the existence of a pattern of prices that differ significantly. See Def.’s Resp. at 25–29; Def.-Int.’s Resp. at 21. For the following reasons, the court sustains the results of Commerce’s remand redetermination.

## I. Price Difference Test

On remand, Commerce reconsiders its differential pricing analysis and adopts a two-percent price difference test to assess whether prices “differ significantly.” See Remand Results at 8–9. The test measures “whether the weighted average net price to a given purchaser, region, or time period is within two-percent of the weighted average net price to all other purchasers, regions, or time periods.” Id. at 8–9. SeAH argues that a two-percent test is not a recognized measure of “effect size,” does not identify a “recognizably consistent” pattern and does not comply with the Statement

on Administrative Action's admonition to measure differences on "a case-by-case basis." Pl. Cmts. at 9, 13, 17; see also Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. 103–316, at 4176 (1994) ("SAA"). For the reasons that follow, Commerce's price difference test is reasonable.

When investigating whether subject merchandise is being sold at less than fair value ("LTFV"), Commerce typically compares the "weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise" ("A-to-A method"). 19 U.S.C. § 1677f-1(d)(1)(A)(i); see also 19 C.F.R. § 351.414(c)(1). However, Section 1677f-1(d)(1)(B)(i) provides that Commerce may use an alternative method for determining if there is a pattern of prices that "differ significantly." See 19 U.S.C. § 1677f-1(d)(1)(B)(i).

> (B) Exception
> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if--
>
> > (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
> > (ii) the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f-1(d)(1)(B). Thus, Commerce may compare the "weighted average of the normal values to export prices (or constructed export prices) of individual transactions for comparable merchandise" ("A-to-T method") so long as (1) there is a "pattern of export prices (or constructed export prices)" "that differs significantly,"

and (2) Commerce explains why the A-to-A method cannot account for such differences. 19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).[2] To determine whether the conditions in Section 1677f-1(d)(1)(B)(i) are met to justify Commerce's use of the A-to-T method, Commerce conducts a differential pricing analysis.[3] See Marmen Inc. v. United States, No. 20-00169, 2026 WL 1726609 at *3 (Ct. Int'l Trade, June 15, 2026) ("Marmen II"). Where the conditions in Section 1677f-1(d)(1)(B)(i) are met, the A-to-T method allows Commerce to address "targeted dumping" by including individual U.S. prices in the margin calculation. See Apex Frozen Foods Priv. Ltd. v. United

---

[2] (d) Determination of less than fair value

(1) Investigations

(A) In general

In an investigation under part II of this subtitle, the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value--

(i) by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or

(ii) by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

[3] Although the court exercises independent judgment when interpreting statutes, Congress has delegated to Commerce "the power to use its discretion when determining whether prices differ significantly." See Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 393 (2024); see also Garg Tube Exp. LLP v. United States, 740 F. Supp. 3d 1355, 1367 (Ct. Int'l Trade 2024). Terms like "significant," "appropriate" and "comparable" in a statute delegate broad authority to Commerce, providing flexibility. See Bio-Lab, Inc. v. United States, 776 F. Supp. 3d 1315, 1329 (Ct. Int'l Trade 2025); Garg Tube, 740 F. Supp. 3d at 1366 ("Congress may give an agency flexibility by its use of open-ended terms such as 'reasonable' or 'appropriate'").

States, 862 F.3d 1337, 1341–42 (Fed. Cir. 2017) (explaining that the A-to-T method addresses targeted dumping).

Here, Commerce chose a two-percent threshold as "a reasonable threshold to determine a measure of significance." Remand Results at 15. Commerce explains and supports its choice. First, it is reasonable for Commerce to measure significant difference using a percentage. The Statement of Administrative Action accompanying the Uruguay Round Agreements Act makes clear that a small difference may be significant in one industry or for one product, but insignificant in another or for a different product. See SAA at 4178. A percentage "measures relative differences on a case-by-case basis" rather than absolute ones and therefore accounts for industry differences as envisioned by the SAA. Remand Results at 14. Thus, contrary to SeAH's argument that Commerce's two-percent price difference test does not comply with the SAA mandate to "proceed on a case-by-case basis," Commerce ensures a differential price analysis that differentiates on a case-by-case basis. See Pl. Cmts. at 17–19; SAA at 4178.

Second, Commerce reasonably considers its experience with measuring significance in other contexts to select a two-percent threshold for the price difference test. Commerce first explains that two-percent is significant because Commerce uses a two-percent test in its arm's length test to calculate normal value. See Remand Results at 15. In its arm's length test to calculate normal value, Commerce determines whether a company's sales to an affiliated party are "outside the course

of ordinary trade" by asking if a sale price to an affiliated party is not within 98 to 102 percent of the sale price to an unaffiliated party. See Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. v. United States, 426 F. Supp. 3d 1395, 1414 (Ct. Int'l Trade 2020); Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade, 67 Fed. Reg. 69186-02, 2002 WL 31523418 at 69187 (Nov. 15, 2002); 19 U.S.C. § 1677b(f)(2).

Likewise, Commerce relies upon the threshold set by Congress in the LTFV calculation under 19 U.S.C. § 1673b(b)(3). See Remand Results at 15–16; 19 U.S.C. § 1673b(b)(3). Congress has provided, under Section 1673b(b)(3), that a weighted average dumping margin is considered de minimis, and therefore disregarded, if it is less than two-percent. See 19 U.S.C. § 1673b(b)(3); see also Remand Results at 16. Commerce explains that a two-percent basis for the price difference test under section 1677f-1(d)(1)(B)(i) is reasonable because a "weighted-average difference of two-percent between U.S. prices and [normal value] is significant enough to warrant an affirmative determination of sales at LTFV." Remand Results at 16. Here, Commerce is similarly using a two-percent reference to determine whether the U.S. prices of a "given purchaser, region, or time period" differs from the weighted average U.S. price for "all other purchasers, regions, or time periods." Id. at 9, 14. Thus, Commerce justifies the measure for "significant" price differences by considering other instances where it identifies significant price differences. See id. at 14–16. Both examples Commerce provides, its arm's length test to calculate normal value

and the de minimis test established by Congress, identify two percent as a difference that is significant. See id. at 14–15. Adopting a standard based on past experience in a similar context is reasonable in this instance. See Tri Union Frozen Prods., Inc. v. United States, 163 F. Supp. 3d 1255, 1308 (Ct. Int'l Trade 2016), aff'd, 741 F. App'x 801 (Fed. Cir. 2018).

SeAH's argument that the two-percent test cannot measure whether prices differ significantly because it is not a recognized measure of effect size fails. See Pl. Cmts. at 11–13. Section 1677f-1(d)(1)(B) does not require Commerce to use a particular method to determine whether a pattern exists nor specifically requires the use of a statistical test.[4] See 19 U.S.C. § 1677f-1(d)(1)(B). Likewise, SeAH's argument that the two-percent test does not identify price differences that are the result of a "recognizably consistent" pattern conflates the requirement that Commerce find prices differ significantly with the need to establish a pattern. See Pl. Cmts. at 9, 11. Commerce explains that the two-percent test is not used to determine whether there is a pattern, but rather, only whether prices differ

[4] In support of its argument that the two-percent test is not a recognized measure of effect size, SeAH argues that the two-percent test is similar to the P/2 test, which Commerce has expressly rejected. See Pl. Cmts. at 13. The P/2 test used a two-percent measure to identify whether "targeted dumping" has occurred. See id. at 11–13. Commerce responds that the two-percent test and P/2 test are different because the two-percent test considers whether prices differ significantly, and the P/2 test was meant to identify "targeted dumping" and thus, Commerce's rejection of the P/2 test is irrelevant. See Remand Results at 11–14. SeAH's argument fails because the P/2 test specifically determined whether there was targeted dumping, and the two-percent test is one step out of three in the differential pricing analysis.

significantly. See Remand Results at 17, 20; see also Stupp II, 5 F.4th at 1355; Toyo Kohan Co., Ltd. v. United States, No. 24-00261, 2026 WL 1459170 at *8 (Ct. Int'l Trade, May 22, 2026). Therefore, Commerce's two-percent price difference test is sustained.

## II. Discontinuing the Mixed Methodology

SeAH argues Commerce's modification of its ratio test, i.e., abandoning its "mixed methodology," is beyond the scope of the Court of Appeals remand and without justification. See Pl. Cmts. at 19–22. Commerce previously applied a "mixed methodology" in which the value of total sales passing the Cohen's d price difference test determined the extent to which Commerce remedied the targeted dumping. See Stupp II, 5 F.4th at 1347. Commerce would first identify all sales which passed the Cohen's d test, meaning the sales prices were "significantly different." Id. If "the total percentage of passing transactions" was between 33 and 66 percent of the value of total sales, Commerce would apply the A-to-T method to only those transactions "passing the Cohen's d test." See Stupp II, 5 F.4th at 1347; see also Stupp I, 359 F. Supp. 3d at 1303. However, if the total percentage of passing sales was 66 percent or more of the total value of sales, Commerce would apply the A-to-T method to all sales. See Stupp II, 5 F.4th at 1347.. Defendant argues that the Court of Appeals' instructions allowed Commerce to "re-perform" or reconsider the ratio test within the differential pricing analysis, and Commerce provided a reasonable explanation for its determination. See Def.'s Resp. at 25–29; see also Stupp IV, 2025 WL 1178392 at *2.

For the reasons that follow, Commerce's determination regarding the modification of the ratio test and its abandonment of the mixed methodology is sustained.

### A. The Scope of the Remand

SeAH argues that the Court of Appeals did not specifically instruct Commerce to reconsider the mixed methodology portion of its differential pricing analysis, but only found that Commerce's "use of Cohen's d was unreasonable." Pl. Cmts. at 19–20. Defendant responds that the Court of Appeals did not place any limits on its remand order, and generally directed Commerce to "re-perform a differential pricing analysis" without relying on Cohen's d. Def.'s Resp. at 25; see also Stupp IV, 2025 WL 1178392 at *2. For the reasons that follow, Commerce's redetermination was not outside the scope of the remand.

On remand, agencies possess broad authority to reconsider the record before them and formulate an appropriate approach consistent with the power given to them by Congress. See Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 201 (1947) ("After the remand was made, therefore, the Commission was bound to deal with the problem afresh, performing the function delegated to it by Congress."); see also Dep't of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1, 20–21 (2020) (citing Chenery, 332 U.S. at 201 (explaining on remand the agency can offer "a fuller explanation of the agency's reasoning at the time of the agency action" or deal with the problem afresh)).

In this remand, the Court of Appeals instructed Commerce to reconsider its differential pricing analysis.

> On remand, Commerce has discretion to do as SeAH wishes, but it also has the opportunity, if it prefers, to re-perform a differential pricing analysis without using Cohen's d, which may result in the use of the average-to-transaction comparison or a hybrid methodology.

Stupp IV, 2025 WL 1178392, at *2 n.1. The Court of Appeals' instruction on remand only limited Commerce's use of Cohen's d. Commerce's differential pricing analysis stems from the exception to A-to-A comparisons provided by 19 U.S.C. § 1677f-1(d)(1)(B), which provides that Commerce may employ A-to-T comparisons of prices where certain conditions are met. See Remand Results at 6–7; 19 U.S.C. § 1677f-1(d)(1)(B). Commerce must identify a "pattern of export prices" for comparable merchandise "that differ significantly among purchasers, regions, or periods of time" and explain why "such differences cannot be taken into account" using an A-to-A comparison. 19 U.S.C. § 1677f-1(d)(1)(B). Commerce's differential pricing analysis prior to Stupp IV comprised of a price difference test (Cohen's d), a pattern test (the ratio test), and the meaningful difference test. See Stupp IV, 2025 WL 1178392 at *1; Marmen I, 134 F.4th at 1344 n.2. Both the ratio test and the meaningful difference test have been approved by the Court of Appeals. See Stupp II, 5 F. 4th at 1355–56 ("Commerce's ratio test reasonably implements the statutory requirement" to find a pattern and affirming "Commerce's use of the meaningful difference test"); Apex Frozen Foods, 862 F.3d at 1348 (holding that "Commerce's meaningful difference analysis" was reasonable). But all three tests were part of one differential

pricing analysis. Thus, Stupp IV's instruction to Commerce to reconsider its differential pricing analysis empowered Commerce to reconsider any one component or all components of its analysis. Therefore, Commerce's remand determination was not beyond the scope of the Stupp IV's remand.

**B. The Ratio Test**

SeAH argues Commerce's ratio test fails to establish a pattern as required by the statute and is particularly ill-suited when used with "an arbitrary test of 'significance' like Commerce's two-percent test." Pl. Cmts. at 16. Defendant argues that the ratio test identifies a pattern (i.e., a "frequent or widespread incidence") and has been upheld by the Court of Appeals as a reasonable method to implement the statutory requirement of a pattern. Def.'s Resp. at 22 (citing Remand Results at 17); see also Stupp II, 5 F. 4th at 1355; Dillinger France S.A. v. United States, 981 F.3d 1318, 1325 (Fed. Cir. 2020). For the reasons that follow, Commerce's ratio test and its application is reasonable.[5]

Section 1677f-1(d)(1)(B)(i) allows Commerce to use the A-to-T method of comparison if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i). Section 1677f-1(d)(1)(B)(i) is silent

[5] SeAH argues that Commerce's use of the two-percent test does not properly identify a pattern under Section 1677f-1(d)(1)(B)(i). See Pl. Cmts. at 11–14. SeAH's argument is misplaced because the price difference test need not identify a pattern because the second step, the ratio test, identifies a pattern under the statute. See Remand Results at 17.

as to how "Commerce must determine a 'pattern.'" Dillinger, 981 F.3d at 1325. A pattern is defined as "a frequent or widespread incidence," Pattern, Merriam-Webster, https://www.merriam-webster.com/dictionary/pattern (last visited Sept. 11, 2026), or a "regular and intelligible form or sequence discernible in certain actions or situations." Pattern, Oxford English Dictionary, https://www.oed.com/dictionary/pattern_n?tab=meaning_and_use#31805251 (last visited Sept. 11, 2026). SeAH proffers that a pattern is "the repeated or regular way in which something happens or is done." Pl. Cmts. at 9. Each of these definitions contemplates a repeated or widespread occurrence of an event.[6] The Court of Appeals has addressed this very point and concluded that Commerce's use of a ratio test to identify a pattern and its choice of 33 percent as a threshold for establishing a pattern are reasonable. See Stupp II, 5 F.4th at 1354–55 ("Commerce's selection of the 33% and 66% cutoffs is a reasonable choice.").

Here, in addition to continuing to use a 33 percent threshold to find a pattern, Commerce abandons its mixed methodology and applies A-to-T comparisons to all sales once the value of price differences exceeds 33 percent of the total value of sales. Previously, under its mixed methodology, once Commerce found a pattern, it would use the A-to-T comparison method in connection with only sales that failed the price

[6] SeAH attempts to cabin the meaning of "pattern" as defining it as distinct from randomness. See Pl.'s Cmts. at 9. SeAH provides a definition of random as "lacking a definite plan, purpose or pattern." Id. at 10. The word in the statute at issue is 'pattern,' not 'non-random.' See 19 U.S.C. § 1677f-1(d)(1)(B)(i).

difference test, and it would use the A-to-T methodology on all sales only if 66 percent or more of the total value of sales failed the test. Id. at 1355. Commerce explains it discontinues the mixed methodology as a matter of administrative policy because it "align[s] more closely with the statutory text" and "enhances the ability to address masked dumping." Remand Results at 23. Commerce's choice is reasonable. The statute requires that Commerce identify a pattern of prices that differ significantly and the Court of Appeals has affirmed that the 33 percent threshold identifies such a pattern. See 19 U.S.C. § 1677f-1(d)(1)(B)(i); Stupp II, 5 F.4th at 1355. Commerce's choice to apply an A-to-T comparison to all sales once significant price differences exceed 33 percent of the total value of all sales, rather than only those which fail the price difference test, to deter targeted dumping, is reasonable because of the underlying remedial purpose of the antidumping duty regime. See Agro Dutch Indus. Ltd. v. United States, 508 F.3d 1024, 1027 (Fed. Cir. 2007) ("The purpose of the antidumping statute is to prevent foreign goods from being sold at unfairly low prices in the United States to the injury of existing or potential United States producers."). Given Commerce's broad authority on remand, and the Court of Appeals' direction to "re-perform" its differential pricing analysis, Commerce reasonably discontinued the mixed methodology. See Stupp IV, 2025 WL 1178392 at *2; see also Universal Tube and Plastic Industries, Ltd., v. United States, No. 23-00113, 2026 WL 2428416 at *10 (Ct. Int'l Trade, August 19, 2026) ("Commerce permissibly revised its differential pricing analysis to discontinue use of the 'mixed method' and to apply the 'ratio test'

"); Government of Canda, Government of Alberta, Government of Quebec, British Columbia Lumber Trade Counsil, Fontaine, Inc., Interfor Corp., and Interfor Sales & Marketing, Ltd., v. United States, No. 23-00187, 2026 WL 2161176 at *7 (Ct. Int'l Trade, July 27, 2026).

**CONCLUSION**

For the foregoing reasons, Commerce's remand results are supported by substantial evidence and comply with the court's Order, June 16, 2025, ECF No. 271, in conformity with the Court of Appeals' Mandate, June 16, 2025, ECF No. 270, and are therefore sustained. Judgment will enter accordingly.

/s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: September 15, 2026
New York, New York